## CASE NO. 16-17202

D. Ct. Case Nos. 2:08-cr-00283-RCJ-PAL and 2:16-cv-02204-RCJ

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JACOREY TAYLOR, AKA Mo-B,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

### APPELLANT'S REPLACEMENT OPENING BRIEF

DICKINSON WRIGHT PLLC
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel: (775) 343-7500
Fax: (844) 670-6009
Email: jbustos@dickinsonwright.com

*Attorney for Appellant Jacorey Taylor*

## **TABLE OF CONTENTS**

Page

I. JURISDICTIONAL STATEMENT ................................................. 1

II. STATEMENT OF BAIL STATUS ............................................... 1

III. CERTIFIED ISSUES PRESENTED ............................................ 1

IV. STATEMENT OF THE CASE .................................................. 2

   A. Procedural Background........................................................... 2

   B. Factual Background................................................................ 4

      1. Genell McGilbra's Testimony ……………………………… 5

      2. Out-of-Court Statements Attributed to Taylor……………… 8

      3. Other Witnesses to the Crime Told a Different Story……… 9

         a. *Sandra Taylor's testimony*…………………………… 9

         b. *Steven Booth's testimony*…………………………… 9

         c. *Jacorey Taylor's testimony*……………………………11

   C. The Jury Instructions ........................................................... 11

      1. Jury Instructions on Count Five (VICAR Murder)………………12

      2. Jury Instructions on Count Six (the 924(c) Charge)………………13

   D. The Jury's Verdict................................................................ 13

   E. Taylor's Direct Appeal ........................................................ 13

   F. Taylor's Pro Se § 2255 Motion .............................................. 14

i

G.  Taylor's Appeal from the Denial of his § 2255 Motion ........................... 15

V.  SUMMARY OF THE ARGUMENT ........................................................ 15

VI.  ARGUMENT ........................................................................ 16

A.  Standard of Review .................................................................. 16

B.  Taylor's *Johnson* Claim is not Procedurally Defaulted ........................... 16

   1.  Taylor Filed his § 2255 Motion Within One Year of the
      Judgment of Conviction Becoming Final............................... 17

   2.  Taylor Filed His § 2255 Motion Within One Year of the
      Supreme Court's Decision in *Welch* that Held *Johnson*
      Applies Retroactively to Cases on Collateral Review.................. 17

C.  Taylor's § 924(c) Conviction Should be Reversed Because
Second Degree Murder Under Nevada Law Does Not
Qualify as a Crime of Violence Under § 924(c)(3)(A)............................ 19

   1.  The Categorical Approach ……………………………………… 20

   2.  Second Degree Murder under Nevada Law is Not
      Categorically a Crime of Violence ………………………… 21

VII.  CONCLUSION ...................................................................... 29

VIII.  STATEMENT OF RELATED CASES ............................................. 30

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Alvarez v. United States*,
  2020 WL 3470522 (E.D. Cal. June 25, 2020) ................................................. 18

*Borden v. United States*,
  141 S. Ct. 1817 (2021) ................................................................... passim

*Clay v. United States*,
  537 U.S. 522 (2003) ........................................................................ 17

*Com. v. Patterson*,
  41 Pa. D. & C. 215 (O. & T. 1941) ...................................................... 27, 28

*Descamps v. United States*,
  570 U.S. 254 (2013) ........................................................................ 20

*Dimaya v. Lynch*,
  803 F.3d 1110 (9th Cir. 2015) ........................................................... 2, 14

*Garcia-Mesa v. United States*,
  2022 WL 2304230 (9th Cir. June 27, 2022) ............................................... 18

*Goetz v. Warden, FCI Lompoc*,
  2020 WL 5665667 (C.D. Cal. Aug. 24, 2020) ............................................... 18

*Grayson v. State*,
  134 Nev. 945 (Nev. App. 2018) ........................................................... 26

*In re Hammoud*,
  931 F.3d 1032 (11th Cir. 2019) .......................................................... 18

*Johnson v. United States*,
  576 U.S. 591 (2015) .................................................................. 2, 14, 17

*Jones v. United States*,
  2021 WL 1749897 (S.D. Cal. May 4, 2021) ................................................. 18

*Keys v. State*,
  104 Nev. 736, 766 P.2d 270 (1988) ..................................................... 24, 26

*Leocal v. Ashcroft*,
  543 U.S. 1, (2004) ........................................................................ 22

*McCurdy v. State*,
  107 Nev. 275 (1991) ....................................................................... 25

*Mendoza v. Carey*,
   449 F.3d 1065 (9th Cir. 2006) ...................................................16

*Schunueringer v. State*,
   130 Nev. 1241 (2014) ..............................................................26

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) .............................................................14

*State v. Hammond*,
   36 S.C.L. 91 (S.C. App. L. 1850) ..............................................27

*State v. Judge*,
   208 S.C. 497 (1946) ........................................................... 26, 27

*State v. Rich*,
   132 N.C. App. 440, 512 S.E.2d 441 (1999) ..............................27

*Thedford v. Sheriff*,
   86 Nev. 741, 476 P.2d 25 (1970) ......................................... 24, 26

*United States v. Aguirre-Ganceda*,
   592 F.3d 1043 (9th Cir. 2010) ...................................................16

*United States v. Balva*,
   2020 WL 1853315 (D. Nev. April 13, 2020) .............................18

*United States v. Begay*,
   33 F.4th 1081 (9th Cir. 2022) ........................................... passim

*United States v. Begay*,
   934 F.3d 1033 (9th Cir. 2019) .................................................3, 4

*United States v. Benally*,
   843 F.3d 350 (9th Cir. 2016) ....................................................16

*United States v. Bowen*,
   936 F.3d 1091 (10th Cir. 2019) ................................................18

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ...................................................... passim

*United States v. Laurico-Yeno*,
   590 F.3d 818 (9th Cir. 2010) ....................................................24

*United States v. Perez*,
   932 F.3d 782 (9th Cir. 2019) ....................................................24

*United States v. Pineda-Doval*,
   614 F.3d 1019 (9th Cir. 2010) ..................................................23

*United States v. Reece*,
   938 F.3d 630 (5th Cir. 2019) ....................................................18

*United States v. Swisher*,
  811 F.3d 299 (9th Cir. 2016) ................................................................16

*Welch v. United States*,
  578 U.S. 120 (2016) ............................................................... 2, 14, 17

**Statutes:**

18 U.S.C. § 16 ......................................................................................14

18 U.S.C. § 924(c) ........................................................................ passim

18 U.S.C. § 924(c)(1)(A) .....................................................................19

18 U.S.C. § 924(c)(3) .................................................................... passim

18 U.S.C. § 924(c)(3)(A) ............................................................... passim

18 U.S.C. § 924(c)(B) .............................................................................3

18 U.S.C. § 924(e) ......................................................................... 21, 22

18 U.S.C. § 924(e)(2)(B)(ii) .................................................................14

18 U.S.C. § 1111 ............................................................................ 23, 29

18 U.S.C. § 1111(a) ....................................................................... 23, 24

18 U.S.C. § 1959(a)(1) and (2) .............................................................12

18 U.S.C. § 3231 ....................................................................................1

28 U.S.C. § 2107 ....................................................................................1

28 U.S.C. § 2255 .......................................................................... passim

28 U.S.C. § 2255(f)(1) ..................................................................... 15, 17

28 U.S.C. § 2255(f)(1), (3) ...................................................................17

28 U.S.C. § 2255(f)(3) ..........................................................................15

28 U.S.C. §§ 1291, 2253(a), and 2255(d) ...............................................1

Nevada Revised Statutes 195.020 and 200.030 ....................................12

NRS 200.010(1) ..................................................................................24

NRS 200.020(2) ..................................................................................24

NRS 200.030 .............................................................................. 20, 24

NRS 200.030(1)(a) ..............................................................................24

NRS 200.030(2) ..................................................................................24

Section 924(c)(3)(B) ..................................................................... 19, 29

Tenn. Code Ann. § 39-13-102(a)(2) ...................................................22

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................1

Ninth Circuit Rule 28 ..........................................................................29

## I.  JURISDICTIONAL STATEMENT

Defendant/Appellant Jacorey Taylor appeals from the District Court's final order dated October 18, 2016, denying his 28 U.S.C. § 2255 motion to vacate, set aside, or correct a conviction and sentence. ER-5.[1] In the same order, the district court also denied Taylor a certificate of appealability on all issues. ER-7. The District Court had jurisdiction over Taylor's motion pursuant to 18 U.S.C. § 3231 and 28 U.S.C. § 2255.

Taylor filed a timely notice of appeal from the order on November 28, 2016. ER-227; *see also*, 28 U.S.C. § 2107; Fed. R. App. P. 4(a)(1)(B). Taylor then requested a certificate of appealability from this Court, which was granted. *See* Docket Entry Nos. 2 and 3-1. This Court has jurisdiction over Taylor's appeal in accordance with 28 U.S.C. §§ 1291, 2253(a), and 2255(d).

## II.  STATEMENT OF BAIL STATUS

Taylor is currently serving his sentence at Thomson USP and has no projected release date because he is serving consecutive life sentences. *See* https://www.bop.gov/inmateloc/.

## III.  CERTIFIED ISSUES PRESENTED

This Court granted a certificate of appealability with respect to the following

---

[1] Citations to "ER" refer to the Excerpts of Record. Thus, this citation refers to the Excerpts of Record at Bates number ER-5.

1

issue:

Did the district court erroneously conclude that Taylor's *Johnson* claim, challenging his 18 U.S.C. § 924(c)(3) conviction, was procedurally defaulted and, if so, is Taylor entitled to any relief. *See* Docket Entry No. 3-1.

## IV.   STATEMENT OF THE CASE

### A.   Procedural Background

Jacorey Taylor is serving consecutive life sentences, ER-30, following his convictions in 2013 for, *inter alia*, Violent Crime in Aid of Racketeering (based on second degree murder under Nevada law), and Use of a Firearm During a Crime of Violence for the VICAR crime (*i.e.*, his 18 U.S.C. § 924(c) conviction). ER-28, 38, 220-221. Following the Supreme Court's decisions in *Johnson v. United States*, 576 U.S. 591 (2015) and *Welch v. United States*, 578 U.S. 120 (2016), as well as the Ninth Circuit's decision in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), Taylor filed a § 2255 motion seeking relief from his § 924(c) conviction. ER-8-19. The District Court erroneously concluded Taylor's *Johnson* claim was procedurally barred and denied the § 2255 motion. ER-5-7.

Taylor appealed the decision and was granted a certificate of appealability. ER-227; Docket Entry No. 3-1. At the same time, this Court also stayed the case pending a final decision in *United States v. Begay*, No. 14-10080. Docket Entry No. 3-1. The stay was subsequently extended while various legal issues in this case were

2

litigated in other cases in this Court and in the Supreme Court. Docket Entry Nos. 18, 27.

While this appeal was pending, the Supreme Court resolved two cases relevant to the issues on appeal: *United States v. Davis*, 139 S. Ct. 2319 (2019) (holding that 18 U.S.C. § 924(c)(B), the residual clause, is unconstitutionally vague), and *Borden v. United States*, 141 S. Ct. 1817 (2021) (holding that a criminal offense that requires only a mens rea of recklessness cannot count as a "violent felony" under the elements clause of the Armed Career Criminal Act ("ACCA")). And during that time, the Ninth Circuit held in *United States v. Begay*, 934 F.3d 1033, 1038-41 (9th Cir. 2019) ("*Begay I*") that second-degree murder does not constitute a "crime of violence" under 18 U.S.C. § 924(c)(3)(A), the elements clause, because it can be committed recklessly. And to qualify as a "crime of violence" under § 924(c)(3)(A), an offense requires "intentional conduct." *Id.* at 1039. After *Begay I* was decided, the government filed a petition for panel rehearing in that case.

On June 15, 2021, this Court terminated the stay and set a briefing schedule. Docket Entry No. 29. Accordingly, Taylor filed his original Opening Brief on July 7, 2021. Docket Entry No. 32. The government then filed an Unopposed Motion to Stay Appellate Proceedings Pending Final Resolution of *United States v. Begay*, which was granted by this Court. Docket Entry Nos. 38, 40.

On May 5, 2022, this Court issued an en banc opinion in *Begay*, holding that second degree murder under federal law is a crime of violence for purposes of § 924(c). *United States v. Begay*, 33 F.4th 1081 (9th Cir. 2022) ("*Begay II*").

On July 15, 2022, this Court entered an Order lifting the stay and directing Taylor to "either move to strike the previously filed opening brief at Docket No. 32, and to file a replacement brief, or notify the court that appellant stands on the previously filed brief." Docket Entry No. 51. Taylor subsequently filed a Motion to Strike the Previously Filed Opening Brief, Docket Entry No. 52, which was granted on August 10, 2022, Docket Entry No. 53.

Taylor now submits this Replacement Opening Brief.

## B.   <u>Factual Background</u>

The Crips and Bloods are rival street gangs. *See* Wikipedia, *Crips*, https://en.wikipedia.org/wiki/Crips (describing history and rivalry between the Crips and Bloods) (last visited September 23, 2022). Crips wear blue colored clothing, *id.*, and Bloods wear red colored clothing. *See* Wikipedia, *Bloods*, https://en.wikipedia.org/wiki/Bloods (describing how Bloods are identified by the red color worn by their members) (last visited September 23, 2022).

The Playboy Bloods are a local "set" or affiliate of the Bloods in Las Vegas, Nevada. ER-212-213. The Full Throttle Clique is a subset of the Playboy Bloods.

ER-213. Jacorey Taylor was a member of the Playboy Bloods and Full Throttle Clique. ER-214-215.

On October 31, 2004, Quaza Burns, a high-ranking member of the Playboy Bloods, was shot. ER-115, 199-200, 203-205. He died in the hospital shortly after midnight on November 1, 2004.[2] ER-115, 166.

### 1.   **Genell McGilbra's Testimony**

After learning about the shooting, Taylor, Reginald Dunlap,[3] and others went to the hospital to see Burns. ER-166. When they learned Burns had died, they agreed to meet at Fabreonne (Fabi) Tillman's house. ER-166-167. At Tillman's house, they decided they were going to go "put in some work," or in other words, "go and find somebody to shoot" because "they had figured a Crip had killed Quaza so they was going to find a Crip to kill." ER-167-168.

Genell McGilbra testified that Taylor and others got guns. ER-170-171. Jacorey Taylor, Sandra Taylor (no relation to Jacorey), Steven Booth, and McGilbra got into McGilbra's white Kia Spectra, with Jacorey Taylor driving. ER-172. Others got into a second car, Reginald Dunlap's blue Cutlass. ER-171.

---

[2] At the time of Taylor's trial, Burns's murder remained unsolved but law enforcement believed it "to be a gang-related murder." ER-192-193.

[3] Reginald Dunlap is also referred to as Bowlie. ER-83.

In the two cars, they drove to known Crip hangouts but did not find anyone outside. ER-173. They then drove to the Pecos Terrace apartments where they spotted Billy Ray Thomas working on his car at about 4:00 a.m. ER-146, 174-176.

Thomas was not affiliated with any gang but was wearing blue sweatpants that day.[4] ER-146, 157-158. He was putting antifreeze in his car in order to take his girlfriend, Kadecia Twitty, and her sister, Kiaana Liggins-Bell, to work.[5] ER-146. Twitty and Liggins-Bell were waiting in the car. ER-146-147.

Jacorey Taylor, Dunlap, and Booth — all wearing black jeans, black hoodies, and carrying guns — got out of the cars and approached Thomas. ER-176-178. McGilbra, who was in the white Kia Spectra, heard Dunlap ask Thomas, "What's up, cuz?" and heard Thomas say, "What's up?" ER-178. She then heard Dunlap say, "Get him," after which she heard gunshots. ER-178. McGilbra explained that when Thomas said, "What's up?" in response to being asked, "What's up, cuz?" they took

---

[4] Thomas's brother, however, was a member of the Donna Street Crips. ER-157. For years, police believed Thomas was murdered by a group known as Anybody's Murderers ("ABM"). ER-155. ABM, a Crips gang, "owned" the Pecos Terrace apartment complex where Thomas was murdered. ER-156.

[5] Kadecia Twitty is also known as Kadecia Williams, and Kiaana Liggins-Bell is also known as Kiaana Griffin. ER-159-160.

it to mean he was a Crip.[6] ER-185. McGilbra, however, did not see who shot Thomas. ER-179-180.

From inside Thomas's car, Twitty heard gunshots, saw Thomas fall to the ground, and saw three people in front of the car, all wearing black hoodies. ER- 146-148.

Thomas was shot eight times and died at the scene. ER-144, 154.

Taylor and the others then returned to Tillman's house, and brought the guns inside. ER-182-183.

On November 5, 2004, a police officer showed Twitty photos, but she did not positively identify any of the shooters. ER-149. Three years later, on June 12, 2007, another officer showed Twitty a photo lineup, and she "immediately recognized [Taylor] as being at the shooting . . ." ER-83, 150-151.

On November 17, 2004, police searched Tillman's house and found two firearms: a Glock 26 9-millimeter and a Ruger P90 .45 caliber semiautomatic pistol. ER-140-141, 186-189. Police asked Tillman who owned the guns, and she told them that they belong to Jacorey Taylor. ER-141.

---

[6] McGilbra testified "when you're a Crip, they say, 'What up, cuz,' and when you're a Blood, they say, 'What up, Blood.' So that's how you identify yourself as being a Crip or a Blood." ER-185.

After police searched Tillman's house, McGilbra heard Taylor and Dunlap say "they hoped that they wiped the guns down good because the guns was tooken from under the mattress." ER-183-184.

On December 31, 2004, several Playboy Bloods were involved in shooting off guns. ER-129-138.

Forensic examination matched some of the shell casings and ammunition from the site of Thomas's murder to the .45 found in Tillman's house and to a 9-millimeter recovered from the December 31, 2004 shooting. ER-120-122.

### 2. <u>Out-of-Court Statements Attributed to Taylor</u>

Carnelius Williams was a member of the Playboy Bloods. ER-163-165, 201-202. He was incarcerated the night Burns and Thomas were murdered. ER-205. Williams said he later asked Taylor who "went riding" that night, because he wanted to know "who was really gangster, who wasn't." ER-206. Taylor made sure that Williams knew he was present at Thomas's murder. ER-207. Dunlap also told Williams he was there and said he did not know if they had killed "the right person or not." ER-208. When Williams asked Taylor why they had committed a "sloppy" crime, Taylor said that "everybody wanted to go put in work for Quaz."[7] ER-209-210.

---

[7] Quaza Burns was known as "Quaz." ER-196.

A jailhouse informant, Greg Lewis, testified that Taylor told him that he "tore up" Thomas, and that he was with Dunlap, Booth, and Manor when he did so. ER-125-126.

### 3. Other Witnesses to the Crime Told a Different Story

#### a. *Sandra Taylor's testimony*

Sandra Taylor (no relation to Jacorey) described the events of Thomas's murder differently. In addition to Jacorey Taylor, Genell McGilbra, Steven Booth and herself, she testified that Joshua Manor was also in the white Kia and was with the others when Thomas was shot. ER-108. She testified that Dunlap approached the white Kia, and that he, Steven Booth, and Joshua Manor (not Jacorey Taylor) went to "the middle of the apartments." ER-109. After they went into the complex, "several gunshots were fired," and "[a] minute or two later, Jacorey [Taylor] got out of the car, ran into the apartments. More gunshots were fired." ER-109-110. However, Sandra Taylor, like McGilbra, did not see who shot Thomas. ER-112.

#### b. *Steven Booth's testimony*

Steven Booth, a codefendant who pleaded guilty to aiding and abetting in Thomas's murder (*see* ER-61, 105), testified that Taylor was not involved in Thomas's murder.[8] ER-100. Booth and Fabi Tillman were dating at the time Burns

---

[8] According to Booth, Taylor "barely could even walk" the night Thomas was killed. ER-65-66, 101. Taylor had been shot three months earlier and had open

was shot. ER-87. When Booth heard about the shooting, he went to University Medical Center (UMC) where he learned Burns had died. ER-88, 90. Booth and Genell McGilbra (Burns's girlfriend) then went to Tillman's house. ER-90-91. Taylor got there about 15 minutes after them. ER-62, 91-92. There were about twenty people at Tillman's house mourning Burns's murder. ER-92. Booth then suggested they "go find who did it." ER-64. They believed the Crips did it. ER-92-93.

Taylor, however, did not accompany them. ER-66-67. Booth, McGilbra, Sandra Taylor, Dunlap, and Manor got into a car to kill somebody (without Taylor). ER-67-68. McGilbra was driving and Booth was in the backseat with Dunlap and Manor. ER-95. Booth, Dunlap, and Manor had guns. ER-70, 98. And McGilbra "always kept a gun." ER-70. They rode around looking for Crips to retaliate against. ER-93, 96. At the Pecos Terrace apartments, Dunlap and Manor got out of the car and "eight, nine" shots were fired by either Dunlap or Manor or both. ER-99, 101. Booth said he was drunk, but he got out of the car and just stood there, and then got back in the car after he heard the shots. ER-79-80. Booth did not see Thomas get shot, and he did not know who shot him. ER-77-78.

---

heart surgery. ER-66. Booth testified Taylor was walking with "a cane or something" that night, and he did not participate in Thomas's murder. ER-67.

According to Booth, there were two carloads of individuals: the one Booth was in and another car that was following behind them. ER-72, 100, 102-103. "[S]ome friends" were in the second car but Booth could not recall specifically who they were. ER-100. He was certain, however, that Taylor was not in the second car because when they got back to Tillman's house "he wasn't there." ER-75. Instead of riding out with the others, Taylor told Booth he left Tillman's house and went to "his baby mama house." ER-101.

### c.    *Jacorey Taylor's Testimony*

Taylor testified at trial. He denied being involved in any retaliation against the Crips for Burns's murder. ER-56. And he denied being involved in Thomas's murder. ER-57-58. He also testified that he knew nothing about the guns found in Tillman's apartment. ER-54-55.

## C.    <u>The Jury Instructions</u>

The jury was instructed that for purposes of Count Five (Violent Crime in Aid of Racketeering Activity (*i.e.*, for Thomas's murder)), *see* ER-220-221, it "makes no difference whether you find the Defendant's actions fall under First Degree Murder or Second Degree Murder." ER-43. "Any act involving murder, whether

First or Second Degree, is a racketeering act under Counts One and Five of the Indictment."[9] ER-43.

The jury was instructed that First Degree murder requires three elements: "willfulness, deliberation, and premeditation." ER-43. Second Degree murder, however, required "malice aforethought, but without premeditation and deliberation." ER-44. Malice aforethought could arise from "*reckless disregard of consequences and social duty*." ER-42 (emphasis added). Therefore, they were told, it "makes no difference in your deliberations whether you find a level of premeditation or deliberation." ER-43.

### 1.    Jury Instruction on Count Five (VICAR Murder)

With regard to Count Five (VICAR murder), the jury was told that Taylor was charged with murder "in violation of Nevada Revised Statutes 195.020 and 200.030" and 18 U.S.C. § 1959(a)(1) and (2). ER-47-48. To be found guilty of this count, the jury had to find, among other things, that "Jacorey Taylor committed the murder of Billy Thomas, or aided and abetted in the murder." ER-48. The Court added:

> The elements of murder in violation of Nevada Revised Statutes 195.020 and 200.030, the alleged crime of violence upon which this Count is predicated, are defined in Count One of these instructions and maintain the same elements and definitions for Count Five.

---

[9] In Count One, Taylor was charged with Rico Conspiracy. ER-41, 212.

ER-48.

### 2.     <u>Jury Instruction on Count Six (the 924(c) Charge)</u>

In addition to finding that Taylor committed the crime in Count Five, the jury had to find that Taylor knowingly used or carried a firearm during and in relation to that crime (murder under Nevada law) to find him guilty of Count Six (Use of a Firearm During a Crime of Violence). ER-49. They were instructed on what it means to "use" or "carry" a firearm "during and in relation" to a crime of violence. ER-49-50.

The jury was also instructed that the government must prove Taylor "committed or aided and abetted *either* first *or* second degree murder." ER-51 (emphasis added). First degree murder required: unlawfully killing Thomas with premeditation, deliberation, and malice aforethought. ER-43-44, 51. Second degree murder required: unlawfully killing Thomas with "malice aforethought," but without premeditation and deliberation. ER-43-44, 51.

### D.   <u>The Jury's Verdict</u>

The jury found Taylor guilty of Counts Five and Six but did not specify whether their verdict was based on first or second degree murder, or aiding and abetting first or second degree murder. ER-38.

### E.   <u>Taylor's Direct Appeal</u>

Taylor challenged the sufficiency of the evidence to convict him of Counts

Five and Six on direct appeal, but a panel of this Court disagreed. The panel found there was sufficient evidence to prove, *inter alia*, that "Taylor was present with a gun when Billy Ray Thomas was murdered." ER-22-23. Taylor filed a petition for a writ of certiorari, which the Supreme Court denied on October 13, 2015. ER-20.

**F.     Taylor's Pro Se § 2255 Motion**

Shortly after Taylor's direct appeal, the Supreme Court held in *Johnson v. United States*, 576 U.S. 591, 602-606 (2015), that 18 U.S.C. § 924(e)(2)(B)(ii) — *i.e.*, the residual clause of the Armed Career Criminal Act (ACCA) defining a "violent felony" — was unconstitutional because it was "void for vagueness" under the Fifth Amendment's Due Process Clause. On April 18, 2016, the Supreme Court held that *Johnson* announced a substantive rule that applied retroactively on collateral review. *Welch v. United States*, 136 S. Ct. 1257, 1265 (2016).

On September 19, 2016, Taylor filed a pro se § 2255 motion, challenging his § 924(c) conviction in accordance with *Johnson*, *Welch*, and the Ninth Circuit's decision in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015).[10] ER-8, 13-14.  The District Court, on its own without hearing from the government first, denied Taylor's

---

[10] On April 17, 2018, the Supreme Court held in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018), that the residual clause of 18 U.S.C. § 16, defining a "crime of violence," was unconstitutionally vague. There is no "material difference in the language or scope" of the "residual clauses" of § 924(c)(3) and § 16. *United States v. Davis*, 139 S. Ct. 2319, 2326 (2019).

*Johnson* claim, finding it was procedurally defaulted, and denied him a certificate of appealability. ER-5, 7.

## G.     Taylor's Appeal from the Denial of his § 2255 Motion

Taylor appealed from the order denying his § 2255 motion and requested a certificate of appealability from this Court, which was granted. ER-227; Docket Entry No. 3-1. The Court certified the following issue: "whether the district court erroneously concluded that [Taylor's] *Johnson* claim was procedurally defaulted and, if so, whether [Taylor] is entitled to any relief." Docket Entry No. 3-1 at 1 (citations omitted).

## V.     SUMMARY OF THE ARGUMENT

Taylor's *Johnson* claim is not procedurally defaulted. His § 2255 motion was filed within one year of the judgment of conviction becoming final, in accordance with 28 U.S.C. § 2255(f)(1). He also filed his § 2255 motion within one year of the Supreme Court's decision in *Welch* that held *Johnson* applied retroactively to cases on collateral review, in accordance with 28 U.S.C. § 2255(f)(3). Therefore, the District Court erred when it determined Taylor's *Johnson* claim was procedurally defaulted.

On the merits, Taylor is entitled to relief from his 18 U.S.C. § 924(c) conviction for using a firearm during and in relation to a crime of violence. The predicate offense at issue is murder under Nevada law. The least of the acts

criminalized is Nevada second-degree murder, which can be committed without directing any action at, or targeting, another individual and, therefore, is insufficient under *Borden* to constitute a crime of violence. Further, unlike a federal murder charge, the jury was not required to find that Taylor acted recklessly with extreme disregard for human life in order to find that he committed second-degree murder. Thus, second-degree murder under Nevada law is not categorically a crime of violence and Taylor's conviction should be reversed.

## VI.    ARGUMENT

### A.    Standard of Review

A district court's decision to grant or deny a federal prisoner's 28 U.S.C. § 2255 motion is reviewed de novo. *United States v. Swisher*, 811 F.3d 299, 306 (9th Cir. 2016) (en banc); *United States v. Aguirre-Ganceda*, 592 F.3d 1043, 1045 (9th Cir. 2010); *Mendoza v. Carey*, 449 F.3d 1065, 1068 (9th Cir. 2006). Further, this Court reviews de novo whether a criminal conviction is a "crime of violence" under 18 U.S.C. § 924(c)(3). *United States v. Benally*, 843 F.3d 350, 353 (9th Cir. 2016).

### B.    Taylor's *Johnson* Claim is not Procedurally Defaulted

The district court erroneously concluded that Taylor's *Johnson* claim was procedurally defaulted. ER-5.

1. **Taylor Filed His § 2255 Motion Within One Year of the Judgment of Conviction Becoming Final**

Taylor's judgment of conviction was entered in 2013. ER-28. It was upheld by this Court on June 11, 2015. ER-21. The Supreme Court denied Taylor's petition for a writ of certiorari on October 13, 2015. ER-20. As such, Taylor's judgment of conviction became final on October 13, 2015. *See Clay v. United States*, 537 U.S. 522, 527-528 (2003). Therefore, Taylor's § 2255 motion filed on September 19, 2016 — challenging his § 924(c) conviction under *Johnson*, *Welch*, and *Dimaya* — was timely. ER-8; *see also* 28 U.S.C. § 2255(f)(1).

2. **Taylor Filed His § 2255 Motion Within One Year of the Supreme Court's Decision in *Welch* that Held *Johnson* Applies Retroactively to Cases on Collateral Review**

*Johnson*, 576 U.S. at 591, was decided on June 26, 2015, but it was not until April 18, 2016, that the Supreme Court held it applied retroactively to cases on collateral review. *Welch*, 578 U.S. at 130. The fact that Taylor asserted his *Johnson* claim on September 19, 2016 (ER-8) — about five (5) months after the Supreme Court's decision in *Welch* — is another reason Taylor's *Johnson* claim is not procedurally defaulted. *See* 28 U.S.C. § 2255(f)(1), (3) (one year limitation period runs from the latest of "the date on which the judgment of conviction becomes final" or "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court ***and*** made

retroactively applicable to cases on collateral review") (emphasis added). Therefore, the District Court erred when it concluded that Taylor's *Johnson* claim was procedurally defaulted. ER-5.

Moreover, while this appeal was stayed, the Supreme Court ruled in *United States v. Davis,* 139 S. Ct. 2319, 2336 (2019), that the residual clause of § 924(c) is unconstitutionally vague in violation of due process. Several circuits have since held that *Davis*, like *Johnson*, announced a new substantive rule that applies retroactively to cases on collateral review. *See e.g.*, *United States v. Bowen*, 936 F.3d 1091, 1097-98 (10th Cir. 2019) (concluding *Davis* announced a "new constitutional rule that is retroactive on collateral review"); *United States v. Reece*, 938 F.3d 630, 635 (5th Cir. 2019) (same); *In re Hammoud*, 931 F.3d 1032, 1039 (11th Cir. 2019) (same); *see also Garcia-Mesa v. United States*, 2022 WL 2304230, at *1 (9th Cir. June 27, 2022) ("As the government rightly concedes, *Davis* did announce a new rule of constitutional law made retroactive to cases on collateral review.") (unpublished).[11]

---

[11] Several district courts in this circuit, including the district of Nevada from where this case arises, have also come to the same conclusion. *See e.g.*, *Jones v. United States*, 2021 WL 1749897, *2 (S.D. Cal. May 4, 2021); *Alvarez v. United States*, 2020 WL 3470522, *2 (E.D. Cal. June 25, 2020); *United States v. Balva*, 2020 WL 1853315, *3 (D. Nev. April 13, 2020); *Goetz v. Warden, FCI Lompoc*, 2020 WL 5665667, at *5 (C.D. Cal. Aug. 24, 2020), report and recommendation adopted, 2020 WL 5658712 (C.D. Cal. Sept. 23, 2020).

**C. Taylor's § 924(c) Conviction Should Be Reversed Because Second Degree Murder Under Nevada Law Does Not Qualify as a Crime of Violence Under § 924(c)(3)(A)**

Taylor is entitled to relief. His § 924(c) conviction, which may be based on second-degree murder under Nevada law, should be reversed and the corresponding life sentence vacated.

18 U.S.C. § 924(c)(1)(A) makes it unlawful for any person to use, carry or possess a firearm "in relation to any crime of violence. . . for which the person may be prosecuted in a court of the United States." Section 924(c)(3) defines a "crime of violence" as a felony that:

> (A)   has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Section 924(c)(3)(A) is commonly referred to as the elements clause. *Davis*, 139 S. Ct. at 2324. Section 924(c)(3)(B) is referred to as the residual clause. *Id.*

As stated above, the Supreme Court held in *Davis* that the residual clause is unconstitutionally vague. As such, Mr. Taylor's conviction can only rest on the elements clause.

1. **<u>The Categorical Approach</u>**

This Court applies the categorical approach to determine whether an offense qualifies as a crime of violence under the elements clause. *Begay II*, 33 F.4th at 1090 (citations omitted). Under the categorical approach, the facts of a given case are irrelevant. *Begay II*, 33 F.4th at 1090 (citations omitted). Instead, courts must compare the defendant's predicate offense with the definition of "crime of violence." *Descamps v. United States*, 570 U.S. 254, 261 (2013). If the predicate offense at issue has the same elements required by § 924(c)(3)(A), then it can serve as a basis for conviction. *See id*. However, if the predicate offense is broader than the definition of "crime of violence" in § 924(c)(3)(A), it cannot serve as a basis for conviction. *See id*. Courts look at the least culpable act criminalized in the predicate offense. *Begay II*, 33 F.4th at 1091.

Here, the least of the acts criminalized for purposes of Taylor's § 924(c) conviction is second-degree murder under Nevada law. Specifically, Taylor was charged in Count Five of the Superseding Indictment with VICAR murder, as defined by Nevada law, NRS 200.030 (defining first and second-degree murder). ER-220-221. The jury was instructed that to convict Taylor of this offense it "makes no difference whether you find the Defendant's actions fall under First Degree Murder or Second Degree Murder." ER-43. "Any act involving murder, whether First or Second Degree" would suffice to convict Taylor of the offense. ER-43.

The jury was also instructed that, in order to convict Taylor of Using a Firearm During a Crime of Violence (Count Six), in violation of 18 U.S.C. § 924(c), the government had to prove that Taylor committed VICAR murder "*as charged in Count Five*," which the Court instructed the jury "is a crime of violence." ER-49 (emphasis added). The Court further reiterated that the government must prove that Taylor committed or aided and abetted **either** first **or** second degree murder. ER-51 (emphasis added).

Therefore, under the categorical approach, the Court must ask whether Taylor's § 924(c) conviction can stand if it rests upon the "least of the acts criminalized," which in this case is second-degree murder under Nevada law. As explained below, it cannot.

### 2. <u>Second Degree Murder under Nevada Law is Not Categorically a Crime of Violence</u>

Second-degree murder with implied malice under Nevada law does not require the same heightened degree of recklessness as the federal murder statute at issue in *Begay II*. Indeed, a defendant can be convicted of second degree murder in Nevada without directing any action at, or targeting, another individual, which is insufficient under both *Borden* and *Begay II*. As such, second-degree murder under Nevada law is not categorically a crime of violence under 924(c)(3)(A).

In *Borden*, 141 S. Ct. at 1821-22, the Supreme Court considered whether a

crime allowing for conviction based on a *mens rea* of recklessness was a categorical match for a crime of violence under the elements clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). In that case, the defendant pled guilty to a felon-in-possession charge and the government sought an enhanced sentence under the ACCA. *Id*. at 1822. One of the three convictions alleged as a predicate was for reckless aggravated assault in violation of Tennessee law. *Id*. The relevant statute defined that crime as "recklessly committing an assault" and either "causing serious bodily injury to another" or "using or displaying a deadly weapon." *Id*. (citing Tenn. Code Ann. § 39-13-102(a)(2)).

The Supreme Court concluded that a reckless offense, such as the Tennessee conviction at issue, cannot qualify as a violent felony under the ACCA. *Id*. at 1822. In analyzing the issue, the Court reviewed four states of mind that may give rise to criminal liability. *Id*. at 1823. "Those mental states are, in descending order of culpability: purpose, knowledge, recklessness, and negligence." *Id*. The Court noted that it had previously held that offenses requiring only a negligent *mens rea* fall outside the elements clause of a relevantly identical statute. *Id*. at 1824 (citing *Leocal v. Ashcroft*, 543 U.S. 1, (2004)).

The *Borden* court extended its holding in *Leocal* to those who act with a *mens rea* of ordinary recklessness. *Id.* at 1827. Critical to the Court's analysis was its conclusion that the phrase "against another," when modifying the "use of force,"

22

"demands that the perpetrator direct his action at, or target, another individual." *Id*. at 1825. Ordinary recklessness is not aimed in that prescribed manner. *Id*. The *Borden* court, however, reserved the question of whether crimes requiring a mental state between recklessness and knowledge (often called "depraved heart" or "extreme recklessness") would qualify as a predicate offense under the ACCA. *Id*. at 1825, n.4.

In *Begay*, this Court decided the question left open by *Borden* and held that second-degree murder under 18 U.S.C. § 1111 is a crime of violence under § 924(c) even though it has a *mens rea* lower than intent or knowledge. *Begay II*, 33 F.4th at 1091. The Court started with the federal definition of murder, which is "'the unlawful killing of a human being with malice aforethought.'" *Id*. (quoting 18 U.S.C. § 1111(a)). Malice aforethought "means to kill *either* deliberately and intentionally *or* recklessly with extreme disregard *for human life." Id.* (emphasis in original). The Court analyzed the least culpable mental state, which was depraved heart murder (*i.e*., reckless indifference). *Id*.

The Court concluded that a conviction for second-degree murder pursuant to federal law is a crime of violence. *Id*. at 1093. The Court emphasized that to kill with malice aforethought means to kill either deliberately or recklessly with extreme disregard for human life. *Id*. It "requires a quantum of risk that is very high and also requires that the nature of the risk concern injury to others." *Id*. (citing *United States*

*v. Pineda-Doval*, 614 F.3d 1019, 1038 (9th Cir. 2010)). Thus, the Court concluded that second-degree murder under federal law "necessarily employs force 'against the person or property of another,' and rather than acting with ordinary recklessness, the defendant acts with recklessness that rises to the level of extreme disregard for human life." *Id*.

In this case, as with 18 U.S.C. § 1111(a), second degree murder under an implied malice theory is the least culpable act criminalized by NRS 200.030. However, unlike 18 U.S.C. § 1111(a), second degree murder under Nevada law can be committed without the degree of recklessness required in *Begay II*.

In determining whether a crime is a crime of violence, this Court considers the statute's text and it may consider the interpretation of the statute provided by state courts. *United States v. Perez*, 932 F.3d 782, 785 (9th Cir. 2019) (citing *United States v. Laurico-Yeno*, 590 F.3d 818, 822 & n.2 (9th Cir. 2010)). Murder under Nevada law is the "unlawful killing of a human being" with express or implied malice aforethought. NRS 200.010(1). First degree murder is a "willful, deliberate and premeditated killing." *See* NRS 200.030(1)(a). Second degree murder is "all other kinds of murder." NRS 200.030(2).

"Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." NRS 200.020(2). "Malice can be present in the absence of an express intent to kill and 'as

applied to murder does not necessarily import ill will toward the victim, but signifies general malignant recklessness of others' lives and safety or disregard of social duty." *Keys v. State*, 104 Nev. 736, 738, 766 P.2d 270, 271 (1988) (citing *Thedford v. Sheriff,* 86 Nev. 741, 744, 476 P.2d 25, 27 (1970)) (emphasis added).

The Nevada Supreme Court has affirmed a conviction for implied malice murder where the defendant did not "direct his action at, or target, another individual," *Borden*, 141 S. Ct. at 1825, or use the type of extreme recklessness at issue in *Begay*. In *McCurdy v. State*, 107 Nev. 275, 278 (1991), the Nevada Supreme Court affirmed a second degree murder conviction on the following facts:

> The circumstances of this killing were that McCurdy approached the victim and his friends in order to stir up trouble. McCurdy threatened the group with a gun, and this behavior eventually led to a confrontation involving opposing gang members. During the turmoil, McCurdy handed Warren the loaded and cocked gun. Before long, Warren joined the fight and eventually shot and killed Frank Perkins with the gun which McCurdy had given him.

*Id.* The *McCurdy* Court concluded that "[h]anding a loaded gun to Warren under these circumstances shows a malicious lack of concern for human life." *Id*.

Although the Nevada Supreme Court concluded that McCurdy's conduct was sufficient to establish second degree murder under Nevada law, the facts in the case demonstrate that McCurdy did not himself use any force against the victim. Instead, McCurdy's conduct consisted of handing a firearm to his co-defendant. As such, McCurdy did not "direct his action at, or target, another individual" as required by

the Supreme Court in *Borden*. And, the defendant in McCurdy did not "necessarily employ[] force 'against the person or property of another'" as was the case with the federal murder statute at issue in *Begay II*.

In addition to not requiring the same degree of recklessness as the federal murder statute, Nevada law also states that implied malice can exist either through "general malignant recklessness of others' lives and safety" or the "disregard of social duty." The fact that implied malice murder can exist based on a "disregard of social duty" renders the Nevada murder statute broader than the federal murder statute as issue in *Begay II*. *See Keys*, 104 Nev. at 738; *see also Grayson v. State*, 134 Nev. 945 (Nev. App. 2018) (citing *Keys*, 104 Nev. at 738); *Schnueringer v. State*, 130 Nev. 1241 n.2 (2014) ("Jury Instruction No. 31 provided, . . . To find defendant(s) guilty of Murder in the Second Degree under a theory of aiding and abetting, the State must prove beyond a reasonable doubt that the defendant(s) intended to commit a battery upon the victim and aided, abetted, counseled, or encouraged another defendant with malignant recklessness of another's life and safety *or in disregard of social duty*.") (emphasis added).

The Nevada Supreme Court has never elaborated or explained the concept of "disregard of social duty" for implied malice murder. This phrase can be traced to the Supreme Court of South Carolina's decision in *State v. Judge*, 208 S.C. 497

(1946).[12] In that case, the Supreme Court of South Carolina defined malice, in part, as "a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief." *Id*. at 505.[13]

An example of implied malice murder based on a disregard of social duty appears in *State v. Hammond*, 36 S.C.L. 91, 103 (S.C. App. L. 1850).[14] In that case, the defendant was found guilty of murdering his father following a quarrel at his father's house. *Id*. at 92. On appeal, the South Carolina Court of Appeals concluded that the evidence was sufficient for the jury to find implied malice based, in part, on "a heart devoid of social duty, and fatally bent upon mischief." *Id*. at 103. Among other things, the Court pointed to evidence showing that the defendant had threatened to pull out a knife and cut someone, he refused to leave the home, and he used the knife to cut his father's legs after his father pushed him out of his chair and onto the floor. *Id*. at 102. The Court concluded that "the bloody combat which

---

[12] *State v. Judge*, 208 S.C. 497 (1946) was cited by the Nevada Supreme Court in *Thedford v. Sheriff,* 86 Nev. 741, 744, 476 P.2d 25, 27 (1970).

[13] The South Carolina Court of Appeals has made it clear that that "'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, *and a mind regardless of social duty and deliberately bent on mischief*' are examples of circumstances which, if proven to exist, allow the jury to infer malice." *State v. Rich*, 132 N.C. App. 440, 446, 512 S.E.2d 441, 446 (1999), *aff'd,* 351 N.C. 386, 527 S.E.2d 299 (2000) (emphasis added).

[14] *See also Com. v. Patterson*, 41 Pa. D. & C. 215, 222 (O. & T. 1941).

followed was but the natural result of the prisoner's unlawful act in cutting the deceased with his knife." *Id*. at 103.

Thus, second degree murder under Nevada law is not categorically a crime of violence because it can be committed without force "against the person or property of another" and it can be committed based on a disregard of social duty. This is confirmed by the jury instructions in this case.

Specifically, in connection with Count One, the jury was instructed as follows:

The condition of mind described as malice aforethought may arise, not alone from anger, hatred, revenge or from particular ill will, spite or grudge toward the person killed, but may also result from any unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief, or with reckless disregard of consequences and social duty.

ER-42. Thus, the jury was not required to find the heightened degree of recklessness at issue in *Begay II*, *i.e.* recklessly with extreme disregard for human life. Instead, the jury was instructed that malice aforethought exists "from any unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief, ***or with reckless disregard of consequences and social duty***." *Id*. (emphasis added). This instruction did not require the jury to find "extreme disregard for human life," which was essential for the holding in *Begay II*.

In Count Five (VICAR murder), the jury was instructed that "[t]he elements of murder . . . are defined in Count One of these instructions and maintain the same elements and definitions for Count Five." ER-48. Then, in Count Six, the jury was

instructed that they had to find, among other things, that Taylor "committed the crime of Violent Crime in Aid of Racketeering as charged in Count Five." ER-49. Thus, the instructions demonstrates that Nevada second-degree murder can be committed with the same type of ordinary recklessness that the Supreme Court found insufficient in *Borden* and does not require the heightened recklessness at issue in *Begay II*.

Based on all the foregoing, unlike a second-degree murder conviction under 18 U.S.C. § 1111, second-degree murder under Nevada law is not categorically a crime of violence under the elements clause, 18 U.S.C. § 924(c)(3)(A). *See Borden*, 2021 WL 2367312, *5. And, pursuant to *Davis*, 139 S. Ct. at 2325-2332, second-degree murder cannot constitute a crime of violence under the residual clause, § 924(c)(3)(B), as the residual clause is unconstitutionally vague. Taylor's § 924(c) conviction for using a firearm during and in relation to a crime of violence, ER-28, 38, 221, therefore cannot stand under either the elements clause or the residual clause of § 924(c)(3).

## VII.  <u>CONCLUSION</u>

Taylor respectfully requests that this Court reverse the District Court's decision denying his 28 U.S.C. § 2255 motion to vacate, set aside, or correct a conviction and sentence. Further, Taylor's § 924(c) conviction should be reversed, and the corresponding life sentence vacated.

## VIII.  **STATEMENT OF RELATED CASES**

Taylor is not aware of any related cases pending in this Court. *See* Ninth

Circuit Rule 28-2.6.

DATED this 26th day of September, 2022.

DICKINSON WRIGHT PLLC


*/s/    Justin J. Bustos*
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty Street, Suite 940
Reno, NV  89501
Tel: (775) 343-7500
Fax: (844) 670-6009

*Attorneys for Appellant Jacorey Taylor*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2022, pursuant to Federal Rule of Appellate Procedure 25(c), I caused to be filed and served through the CM/ECF system of the United States Court of Appeals for the Ninth Circuit **APPELLANT JACOREY TAYLOR'S REPLACEMENT OPENING BRIEF** on the party set forth below:

Jason M. Frierson
United States Attorney
Elizabeth O. White
Appellate Chief
Adam Flake
Assistant United States Attorney
District of Nevada
501 Las Vegas Blvd S., Suite 1100
Las Vegas, Nevada 89101

*Attorneys for the United States*

DATED this 26th day of September, 2022

*/s/ Laura P. Browning*
An Employee of Dickinson Wright PLLC

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This motion complies with the length limits permitted by Fed. R. App. P. 32(f) because it contains 6,697 words.

2.    Pursuant to Fed. R. App. P. 27(d)(1), this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

4874-9528-8883 v1 [102070-1]

32