CA No. 16-17202

# In the
# United States Court of Appeals
# For the Ninth Circuit

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JACOREY TAYLOR, a.k.a. MO-B

Defendant-Appellant.

On Appeal from the United States District Court
for the District of Nevada,

**District Court No. 2:08-cr-283-RCJ-PAL (Robert C. Jones, *J.*)**

## GOVERNMENT'S ANSWERING BRIEF

JASON M. FRIERSON
United States Attorney

ELIZABETH O. WHITE
Appellate Chief

ADAM FLAKE
Assistant U.S. Attorney
501 Las Vegas Boulevard South
Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
adam.flake@usdoj.gov
*Attorneys for the United States*

Date submitted: November 16, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................iii

I.  STATEMENT OF JURISDICTION AND BAIL STATUS ................ 1

II. ISSUE PRESENTED FOR REVIEW ................................................. 1

Whether Taylor procedurally defaulted his claim that second-degree murder in violation of Nevada Revised Statute 200.030 is not a valid predicate crime of violence for purposes of 18 U.S.C. § 924(c); and whether, in any event, that claim lacks merit because second-degree murder requires that the defendant kill either intentionally or recklessly with extreme disregard for human life.

III. STATEMENT OF THE CASE ............................................................ 2

IV. STATEMENT OF THE FACTS .......................................................... 3

    A.  The Playboy Bloods Enterprise ................................................. 3

    B.  Playboy Bloods Engage in Acts of Violence, Including the Murder
        of a Security Guard. .................................................................. 6

    C.  Taylor and Other Playboy Bloods Manufacture, Possess, and
        Distribute Narcotics. ................................................................. 8

    D.  Taylor and Another Playboy Blood Commit Federal Robbery of
        the Klondike Casino. ................................................................. 9

    E.  Taylor and Other Playboy Bloods Murder Billy Ray Thomas to
        Retaliate for a Gang Member's Murder ....................................... 9

V.  SUMMARY OF ARGUMENT ......................................................... 13

VI. ARGUMENT ................................................................................. 14

i

A.   Standard of Review..................................................................... 14

B.   Analytical Framework ............................................................... 14

C.   Taylor Cannot Show Prejudice.................................................. 15

D.   Taylor Cannot Show Actual Innocence. ................................... 22

E.   Taylor's Procedurally Defaulted Claim Lacks Merit in Any
     Event. ........................................................................................ 22

VII.  CONCLUSION ................................................................................. 23

VIII. STATEMENT OF RELATED CASES .............................................. 24

      CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Federal Cases

*Borden v. United States*, 141 S. Ct. 1817 (2021) ................................................. 15

*Bousley v. United States*, 523 U.S. 614 (1998) .............................................14, 15

*Johnson v. United States*, 576 U.S. 591 (2015) ........................................... 3, 15

*McCurdy v. Att'y Gen.*, 229 F. App'x 665 (9th Cir. 2007) ............................... 19

*Murray v. Carrier*, 477 U.S. 478 (1986) ......................................................... 15

*Schlup v. Delo*, 513 U.S. 298 (1995) ............................................................... 22

*United States v. Begay*, 33 F.4th 1081 (9th Cir. 2022)............................ 3, 16, 17

*United States v. Frady*, 456 U.S. 152 (1982) ................................................... 14

*United States v. Johnson*, 988 F.2d 941 (9th Cir. 1993).................................... 14

*United States v. Ratigan*, 351 F.3d 957 (9th Cir. 2003) .................................... 14

*United States v. Taylor*, 617 F. App'x 671 (9th Cir. 2015) ........................... 2, 22

*Young v. United States*, 22 F.4th 1115 (9th Cir. 2022)..................................... 18

## State Cases

*Ayala v. State*, 128 Nev. 880 (2012) .........................................................20, 21

*Collman v. State*, 7 P.3d 426 (2000).................................................................. 16

*Cruz v. State*, 128 Nev. 891 (2012)................................................................... 21

*Grayson v. State*, 134 Nev. 945 (Nev. App. 2018) .......................................... 20

*Guidry v. State*, 510 P.3d 782 (2022)................................................................ 16

*Jefferson v. State*, 130 Nev. 1201 (2014) .......................................................... 19

*McCurdy v. State*, 107 Nev. 275 (1991) ................................................. 17, 18, 19

*Sheriff, Douglas Cnty. v. LaMotte*, 100 Nev. 270 (1984) .................................... 21

*State v. Hammond*, 36 S.C.L. 91 (S.C. App. L. 1850)...................................... 20

*Thedford v. Sheriff, Clark County*, 86 Nev. 741 (1970)...................................... 18

*Turner v. State*, 129 Nev. 1158 (2013) .......................................................... 21

**Federal Statutes**

18 U.S.C. § 924.............................................................................*passim*

18 U.S.C. § 3231 ................................................................................... 1

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 2255 ..........................................................................1, 2, 14

**State Statutes**

N.R.S. § 200.010.................................................................................. 16

N.R.S. § 200.020.................................................................................. 16

N.R.S. § 200.030.................................................................................. 1

**Federal Rules**

Fed. R. App. P. 32 ............................................................................... 25

# I.

## STATEMENT OF JURISDICTION AND BAIL STATUS

Defendant-Appellant Jacorey Taylor appeals the district court's order denying his 28 U.S.C. § 2255 motion. The district court had jurisdiction under 18 U.S.C. § 3231 and 28 U.S.C. § 2255, and it denied Taylor's motion on October 18, 2016. ER-5–7.[1] Taylor filed a timely notice of appeal on November 28, 2016. ER-227. This Court has jurisdiction under 28 U.S.C. § 1291.

Taylor is in federal custody at Thomson FCI serving one consecutive, and two concurrent, life sentences. *See* bop.gov.

# II.

## ISSUE PRESENTED FOR REVIEW

Whether Taylor procedurally defaulted his claim that second-degree murder in violation of Nevada Revised Statute ("NRS") 200.030 is not a valid predicate crime of violence for purposes of 18 U.S.C. § 924(c); and whether, in any event, that claim lacks merit because second-degree murder requires that the defendant kill either intentionally or recklessly with extreme disregard for human life.

---

[1] "ER" denotes Taylor's excerpts of record; "SER" denotes the government's supplemental excerpts of record; "AOB" denotes Taylor's opening brief; and "CR" denotes the district court's docket.

## III.

## STATEMENT OF THE CASE

In January 2012, a federal grand jury in Nevada returned a superseding indictment against Taylor and others, charging Taylor with numerous racketeering, drug trafficking, and gun crimes. ER-211, 219. In May 2013, after a 20-day trial, a jury convicted Taylor on all of the counts in which he was named. CR 893. Pursuant to a special verdict form, the jury found that within a ten-year period, the Playboy Bloods committed state murder; state extortion; federal robbery; federal extortion; drug distribution, manufacture, and possession with intent to distribute; and maintained drug-involved premises. ER-37–39. The jury also found that the offenses involved 280 grams or more of crack cocaine. ER-38.

In October 2013, the district court sentenced Taylor to 240 months' imprisonment on counts 1, 17, and 18, to run concurrently; life sentences on counts 5 and 9, to run concurrent; and a life sentence on count 6, to run consecutively. ER-28–35 (judgement). Taylor appealed, challenging the sufficiency of the evidence among other things, and this Court affirmed. *United States v. Taylor*, 617 F. App'x 671, 672 (9th Cir. 2015).

Within a year of his conviction becoming final, Taylor filed a 28 U.S.C. § 2255 motion, raising six grounds for relief. ER-8–20. Construed liberally,

ground three included the claim that Taylor's § 924(c) conviction cannot stand in light of *Johnson v. United States*, 576 U.S. 591 (2015). ER-14. The district court denied the motion without ordering a response from the government. ER-5–7. This Court granted Taylor a certificate of appealability on the issue presented for review above.

Taylor appealed and filed his opening brief, but the case was eventually stayed pending this Court's resolution of *United States v. Begay*, No. 14-10080. After issuing its *en banc* opinion in *Begay*, the Court lifted the stay in this case, Taylor filed a replacement opening brief, and the government hereby responds.

## IV.

## STATEMENT OF THE FACTS

### A. The Playboy Bloods Enterprise

Taylor was a member of the Playboy Bloods. 1-SER-111–112, 132, 274–275. The Playboy Bloods power structure included "original gangsters" ("OGs"); "gangsters" ("Gs"); "young gangsters" ("YGs"); and "baby gangsters" ("BGs"). 1-SER–70-71. An OG was allowed to "call a shot," 1-SER-71, or in other words, give an order that lower-ranking members of the gang were expected to follow. 1-SER-75. A "G" could call a shot "from time to time. YGs not so much. Baby gangsters never, they soldiers." 1-SER-71.

To join the Playboy Bloods, some people were required to "be quoted on," meaning that they had to fight someone from the gang "to see if you got any type of heart, see if you going to fold under the pressure." 1-SER-51. Other people were "blessed on," meaning they were not required to fight another gang member because they had grown up in the area, or because they had a family member from the area. *Id.* Yet others were allowed to join the gang if they committed violent acts at the direction of an "OG." 1-SER-75.

People had different roles in the gang: "you got some dude that's shooters, you got some dude that's gangsters, you got some dude that killers, you got some dude that's—just militant and soldiers, I mean, they just fight." 1-SER-68.

Williams testified that he progressed through the ranks of the gang "by doing other little acts like selling dope, violent acts" and that he "became a G eventually." 1-SER-72–74. He testified that by 2005–2007, Taylor was "a full-fledged G." 1-SER-72–73.

Williams also explained, "You get the most respect for being violent. You get a little bit of respect for selling some dope in there. But when you pop your gun it's a different world. People respect you different, they fear you." 1-SER-76. Retaliating on behalf of the gang was "the easiest way . . . the best way" of rising through the group; if a person chose not to retaliate, he was

4

"frowned upon," would "look like a sucker," and would be treated like the gang did not want him around for anything besides "rolling our blunts." *Id.*

Members of the gang often wore red and black, and had similar tattoos, such as the "Playboy" bunny or the letters P and B. 1-SER-66. Gang members often had nicknames ending with the letters P or B, such as Ketty-P, Mo-B, and Mikey-P. *Id.*

The Playboy Bloods controlled and operated in a Las Vegas housing complex called Sherman Gardens, more commonly known as "the Jets," and the surrounding area. 1-SER-67, 89, 129. Williams explained that if a person did not buy the gang's supply of narcotics in the Jets, he or she would not be allowed to sell there, and that it was "the norm" to buy the drugs he sold from other Playboy Bloods. 1-SER-89.

Las Vegas was also home to other Blood gangs, including the Piru Bloods and the West Coast Bloods. 1-SER-16, 127. The Playboy Bloods would allow members of other Blood gangs to enter their territory. 1-SER-95. Nevertheless, some tension existed between the Playboy Bloods and the other Blood gangs. *See, e.g.*, 1-SER-173, 176.

The Playboy Bloods's rival gang, the Crips, often wore blue. 1-SER-43, 229. The gangs had different ways of greeting each other: "[W]hen you're a Crip, they say, 'What up, cuz,' and when you're a Blood, they say, 'What up,

5

Blood.' So that's how you identify yourself as being a Crip or a Blood." 1-SER-251.

If the Playboy Bloods caught someone else selling narcotics in their territory, they would "tear them out the frame," *i.e.*, "[k]nock them out their shoes, whack them with a cane." 1-SER-83. Former Piru Blood and FBI informant Nicole Fountain testified that if Crips had come into the area where the Playboy Bloods were dealing drugs, the Playboy Bloods would be expected to come together to protect their territory. 1-SER-179.

## B.    Playboy Bloods Engage in Acts of Violence, Including the Murder of a Security Guard.

The government introduced evidence of several incidents of violence or intimidation perpetrated by the Playboy Bloods directed at people who threatened the operation of the enterprise. For example, on May 12, 2002, Playboy Blood Jomaine Bobbitt shot at someone he thought was a Crip because that person said, "What up, cuz?" to him. 1-SER-4, 7, 13; 2-ER-359–360. Speaking to police, Taylor denied any knowledge of the incident, but admitted that he had been riding in Bobbitt's car shortly thereafter. 1-SER-71. He also acknowledged to police that they would likely find his fingerprints on a firearm recovered during the subsequent search of that car. 1-SER-12; 2-SER-360.

On another occasion, Taylor and Tillman pulled up in a car to someone using a payphone—who happened to be wearing blue—and pointed a gun at him. 1-SER-215–216.

Armed security guards patrolled the Jets. 1-SER-199. If people who did not live there caused problems, the guards would detain them until Las Vegas Metropolitan Police Department officers could come and arrest them for trespassing. 1-SER-201. In one instance, security guard Jeffrey Hirsch and his fellow guards attempted to detain Taylor and Tillman for trespassing, but Taylor and Tillman "let [them] know that this was their neighborhood and that they weren't going to be leaving." 1-SER-205–206. Before the guards could detain Taylor and Tillman, the two ran off, grabbed some bottles, and threw them at the guards. 1-SER-206–207.

On June 23, 2003, Hirsch was patrolling the Jets with fellow guards Michael Lamprey and Brian Wilcox when they encountered a group of 30-40 people—almost all wearing red—who started throwing chunks of concrete at them. 1-SER-207–208, 214. Tillman ran up to Hirsch and hit him on his bulletproof vest, and another unidentified person attempted to strike Hirsch with a road barricade. 1-SER-209, 214. Hirsch saw Taylor, Tillman, and other people drive away from the scene. 1-SER-209, 212. At trial, Taylor admitted

he was there, but said, "I probably threw one rock, if that. I didn't hit nobody with a rock." 2-SER-363.

On January 20, 2004, Wilcox and another security guard approached Booth and several other Playboy Bloods and told them to leave the property, but an argument ensued. 2-SER-321, 339. When the argument became intense, the guards rode away on their bicycles to call for back-up, and one of the Playboy Bloods shot Wilcox in the back three times, killing him. 2-SER-321–322.

## C. Taylor and Other Playboy Bloods Manufacture, Possess, and Distribute Narcotics.

Using informant Fountain, FBI agents arranged for the controlled purchase of crack cocaine from several Playboy Blood members, including Taylor. 1-SER-183–196.

Among the many drug transactions discussed at trial, Fountain bought half an ounce of rock cocaine from Taylor for $300 on January 4, 2007. 1-SER-159, 189–190. She also purchased a half-ounce of rock cocaine from Taylor for $300 on January 9, 2007. 1-SER-160–161, 191–192. On January 31, 2007, Fountain called Taylor asking him to sell her one half-ounce of rock cocaine for $275, and Taylor said that he would. 1-SER-166–167, 193. A short time later, Taylor called her and asked her if she saw the "girls" he sent. 1-SER-169.

Fountain then entered a car driven by a woman and exchanged the $275 for one half-ounce of rock cocaine. 1-SER-170, 193.

Witnesses testified that they had seen several Playboy Bloods "cook" powder cocaine into "rock" cocaine. 1-SER-92, 144, 152.

## D. Taylor and Another Playboy Blood Rob the Klondike Casino.

On March 21, 2002, Taylor and Jesse James Cooper robbed the Klondike Casino. 2-SER-344. In perpetrating the robbery, Taylor fired an M-16 assault rifle and yelled at the people in the casino to get down. 2-SER-345. Cooper had a .38 revolver. 1-SER-39. Taylor, Cooper, and a getaway driver (whom Cooper identified as a Playboy Blood, but did not name, 1-SER-47) drove off and did not yield when police attempted to pull them over. 1-SER-20, 35. Instead, they drove into a parking lot, where they struck a parked pickup truck. 1-SER-24. Cooper, Taylor, and the getaway driver fled on foot. 1-SER-24–25. Police caught and apprehended Cooper, but Taylor and the getaway driver escaped. 1-SER-28, 32.

## E. Taylor and Other Playboy Bloods Murder Billy Ray Thomas to Retaliate for a Gang Member's Murder.

Quaza Burns was a high-ranking member of the Playboy Bloods. 1-SER-69–70 (Burns was an "OG" who "had more respect than you can imagine" because he was so violent); 1-SER-98–100 (everyone looked up to him). On October 31, 2004, he was shot, and he died in the hospital shortly after

midnight on November 1, 2004. 2-SER-313. His murder was a "[h]uge deal …
[b]ecause he was … one of their elite." 1-SER-100.

After learning about the shooting, Taylor and other Playboy Blood
members went to the hospital to see Burns. 1-SER-227. After they learned that
Burns had died, they agreed to meet at Fabreonne Tillman's house. *Id.* There,
they decided they were going to go "put in some work," or in other words, "go
and find somebody to shoot" because "they had figured a Crip had killed
Quaza so they was going to find a Crip to kill." 1-SER-228–229.

Taylor and others got guns. 1-SER-232. Jacorey Taylor, Sandra Taylor,
Steven Booth, and Genell McGilbra got into McGilbra's white Kia Spectra,
with Jacorey Taylor driving. 1-SER-233. Others got into a second car,
Reginald Dunlap's blue Cutlass. 1-SER-232.

In the two cars, they drove to two known Crip hangouts but did not find
anyone outside. 1-SER-234. They then drove to the Pecos Terrace apartments,
where they spotted Billy Ray Thomas working on his car at about 4:00 a.m. 1-
SER-235–237, 281.

Thomas was not affiliated with any gang, but had the extreme
misfortune of deciding to wear blue sweatpants that day. 1-SER-224, 281.
Thomas was putting antifreeze in his car in anticipation of taking his girlfriend,

Kadecia Twitty, and her sister, Kiaana Liggins-Bell, to work. 1-SER-281. Twitty and Liggins-Bell were waiting in the car. 1-SER-281–282.

Taylor, Dunlap, and Booth—all wearing black pants and black hoodies and carrying guns—got out of the cars, and approached Thomas. 1-SER- 237–239. Genell McGilbra, who was in the white Kia Spectra, heard Dunlap ask Thomas, "What's up, cuz?" and heard Thomas say, "What's up?" 1-SER-239. She then heard Dunlap say, "Get him," after which she heard gunshots. *Id*. McGilbra explained that when Thomas said, "What's up?" in response to being asked, "What's up, cuz?" they took it to mean he was a Crip. 1-SER-251.

From inside Thomas's car, Twitty heard gunshots, saw Thomas fall to the ground, and saw three people in front of the car, all wearing black hoodies. 1-SER-281-282. Thomas had been shot eight times, 1-SER-278, and he died at the scene. 1-SER-221.

Taylor and the others then returned to Fabreonne Tillman's house, and brought the guns inside. 1-SER-243–244.

On November 5, 2004, a police officer showed Twitty photos, but she did not positively identify any of the shooters. ER-110. Twitty testified that she was afraid to identify anyone because at that time, she lived in the Pecos Terrace apartments where the shooting had taken place. 1-SER-291; 2-SER-

299. On June 12, 2007, another officer showed Twitty a photo lineup, and she "immediately recognized [Taylor] as being at the shooting . . . ." 1-SER-294; 2-SER-317; ER-83.

On November 17, 2004, police searched Fabreonne Tillman's home, and found two firearms—a Glock 26 9-milimeter and a Ruger P90 .45 caliber semiautomatic pistol. 1-SER-254–257, 273–274. Police asked Tillman who owned the guns, and she said that Jacorey Taylor did. 1-SER-274.

After police searched Tillman's residence, McGilbra heard Taylor and Dunlap say that "they hoped that they wiped the guns down good because the guns was tooken from under the mattress." 1-SER-245.

On December 31, 2004, several Playboy Bloods were involved in shooting off guns. 1-SER-261–270. Forensic examination matched some of the shell casings and ammunition from the site of Thomas's murder to the .45 found in Tillman's house and to a 9-millimeter recovered from the December 31, 2004, shooting. ER-120–121.

Williams, who was incarcerated the night Burns and Thomas were murdered, 1-SER-107, later asked Taylor who "went riding" that night because he wanted to know "who was really gangster, who wasn't." 1-SER-103. Taylor made sure that Williams knew he was present at Thomas's murder. 1-SER-104. Dunlap likewise told Williams he was there, and said he didn't know if

12

they had killed "the right person or not." 1-SER-104–105. When Williams

asked Taylor why they had committed a "sloppy" crime, Taylor said that

"everybody wanted to go put in work for Quaz." 1-SER-106–107.

Williams also testified that there was a general feeling among the

members of the gang that they needed to retaliate for Burns's murder

> [b]ecause if you don't retaliate, and somebody come and knock
> somebody off that's from your hood or gang, then you going to look
> weak. If you look weak in the streets, and you out there in that life,
> you can't make money so that way you can't feed your family. If
> you continue to let people do that, they going to push you out the
> way.

1-SER-108–109 (paragraph break omitted).

Jailhouse informant Greg Lewis testified that Taylor told him that he

"tore up" Bill Ray Thomas, and that he was with Dunlap, Booth, and Manor

when he did so. ER-125.

## V.

## SUMMARY OF ARGUMENT

By failing to argue on direct appeal that his § 924(c) conviction rested on

an invalid predicate crime of violence, Taylor procedurally defaulted on that

claim, and he cannot show cause and prejudice or actual innocence to excuse

his procedural default. Even if this Court were to reach the merits of his

argument, he is not entitled to relief because Nevada second-degree murder,

which requires a higher showing of culpability than ordinary recklessness, is a valid predicate for a conviction under 18 U.S.C. § 924(c).

# VI.

# ARGUMENT

## A.    Standard of Review

"A district court's denial of a § 2255 motion is reviewed de novo." *United States v. Ratigan*, 351 F.3d 957, 961 (9th Cir. 2003).

## B.    Analytical Framework

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998). After a defendant's "chance to appeal has been waived or exhausted," the Court is "entitled to presume he stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982). The federal habeas process "is not designed to provide criminal defendants multiple opportunities to challenge their sentence." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993). Indeed, "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. at 167.

If the movant did not challenge on direct appeal a claim he raises in a section 2255 motion, that claim is procedurally defaulted. *Bousley*, 523 U.S. at 621. The Court may not reach a procedurally defaulted claim unless the

14

movant shows "cause and prejudice" or actual innocence. *Id.* at 622. A movant may show cause by demonstrating an "external impediment" that prevented him from asserting a claim on direct review, and may show prejudice by demonstrating the detriment attributable to the cause. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).[2]

## C.     Taylor Cannot Show Prejudice.

A person who uses or carries a firearm during and in relation to a crime of violence violates § 924(c)(1). Subsection (c)(3) defines the term "crime of violence," in relevant part, as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." To determine whether an underlying crime is a crime of violence, the Court applies the categorical approach, in which the Court's focus is "whether the elements of the statute of conviction meet the federal standard." *Borden v. United States*, 141 S. Ct. 1817, 1822 (2021). As applied here, the categorical approach requires that the Court ask whether the

---

[2]     In asserting that his claim is not procedurally defaulted because he raised it within a year of his conviction becoming final and within five months of the Supreme Court's holding that *Johnson* applied retroactively, *see* AOB 17, Taylor confuses procedural default with untimeliness. Although his motion was timely, it sought to raise several claims that Taylor had not raised on direct appeal, and those claims were therefore procedurally defaulted and cannot be considered unless Taylor can demonstrate both cause and prejudice to excuse the default.

elements of Nevada second-degree murder necessarily involve the use, attempted use, or threatened use of physical force against the person or property of another. *See United States v. Begay*, 33 F.4th 1081, 1090-91 (9th Cir. 2022) (applying categorical approach to second-degree murder in violation of 18 U.S.C. § 1111 and holding that it is a crime of violence under § 924(c)).

In Nevada, "[m]urder is the 'unlawful killing of a human being' with express or implied malice aforethought." *Guidry v. State*, 510 P.3d 782, 787-88 (2022) (citing NRS 200.010(1) and 2 Wayne R. LaFave, Substantive Criminal Law § 14.1(a) (3d ed. 2017) (summarizing the modern categories of murder)). "To find a defendant guilty of killing with express malice, the jury must find that the defendant intended to kill." *Id*. (citing NRS 200.020). "[F]or implied malice under a 'depraved heart' theory of second-degree murder, the defendant must have acted with extreme recklessness regarding the risk to and conscious disregard for human life." *Id*. (quoting *Collman v. State*, 7 P.3d 426, 444-45 & n.13 (2000) (other citations omitted)).

In *Begay*, the Court held that second-degree murder in violation of federal law "qualifies as a crime of violence because a defendant who acts with the requisite mens rea … necessarily employs force 'against the person or property of another,' and rather than acting with ordinary recklessness, the defendant acts with recklessness that rises to the level of extreme disregard for

human life." 33 F.4th at 1093. It also noted that "[t]he distinction between degrees of recklessness is critical to our conclusion." *Id*. at 1094. While crimes that require a showing of only simple recklessness do not come within the § 924(c)'s definition of a crime of violence, crimes that require a showing of recklessness with extreme disregard for human life do. *Id*.

As quoted above, like federal law, Nevada second-degree murder requires extreme recklessness and conscious disregard of human life. Accordingly, Nevada second-degree murder is a crime of violence within the meaning of 18 U.S.C. § 924(c)(3)(1).

On appeal, Taylor argues that Nevada second-degree murder is not a crime of violence because it does not require the same showing as federal second-degree murder. AOB 21. Specifically, he argues that "a defendant can be convicted of second degree murder in Nevada without directing any action at, or targeting, another individual …." *Id*. In support of this argument, he cites *McCurdy v. State*, 107 Nev. 275 (1991), in which the Nevada Supreme Court upheld Defendant McCurdy's second-degree murder conviction when McCurdy approached the victim and his friends to stir up trouble, threatened the group with a gun, gave the gun, loaded and cocked, to Warren, and Warren joined the fight and shot and killed the victim, concluding:

> Handing a loaded gun to Warren under these circumstances shows
> a malicious lack of concern for human life. Implied malice "signifies

17

> general malignant recklessness of others' lives and safety or disregard of social duty." *Thedford v. Sheriff, Clark County*, 86 Nev. 741, 744 (1970). The jury could have properly concluded that, from McCurdy's perspective, it should have been clear that handing the gun to Warren under these circumstances was malignantly reckless and that death or serious injury was likely to result.

*Id.* at 278. Taylor argues that *McCurdy* shows a defendant can be convicted of second-degree murder without directing force at the victim, AOB 25, but this argument ignores the fact that a person guilty of aiding and abetting a crime of violence is guilty of the crime of violence. *See Young v. United States*, 22 F.4th 1115, 1122–23 (9th Cir. 2022) ("[A] person guilty of aiding and abetting a crime of violence is necessarily guilty of the crime of violence…. [T]here is no distinction between aiding-and-abetting liability and liability as a principal under federal law. Aiding and abetting is not a separate offense; it is simply one means of committing the underlying crime…. Thus, to the extent Lewis and Young have been found guilty of armed bank robbery under an aiding-and-abetting theory, they are treated as if they committed the offense as principals….[B]ecause armed bank robbery is categorically a crime of violence, a person who aids or abets armed bank robbery falls, like a principal, within the scope of the definition of the underlying offense and is deemed to have committed a crime of violence under § 924(c)'s elements clause.") (citations and quotations omitted).

And indeed, while the Nevada Supreme Court in *McCurdy* did not specifically explain that McCurdy was guilty under an aiding-and-abetting theory, subsequent litigation in that case made this fact plain, as this Court explicitly recognized. *See McCurdy v. Att'y Gen.*, 229 F. App'x 665, 667 (9th Cir. 2007) (unpublished) ("McCurdy also asserts that there is no such thing as aiding and abetting implied malice murder, and that the Nevada Supreme Court failed to appreciate that McCurdy was convicted under an aiding and abetting theory. The Nevada Supreme Court opinion reflects that the court was aware that McCurdy did not shoot the victim, and instead handed the gun to Warren, who shot the victim.… Although the Nevada opinion did not use the words 'aiding and abetting' or 'accomplice liability,' a review of the opinion shows that the court was aware that McCurdy did not actually kill the victim.… That the Nevada Supreme Court did not explicitly address this point does not change the analysis. We cannot reexamine the Nevada Supreme Court's decision on a point of Nevada state law and hold that implied malice murder does not exist under Nevada state law.") (citations omitted); *see also Jefferson v. State*, 130 Nev. 1201 (2014) (unpublished) (second-degree murder can be based on a theory of aiding and abetting).

Taylor notes case law and the jury instruction in this case stating that Nevada second-degree murder can be committed when a person acts with

"general malignant recklessness of others' lives and safety or disregard of social duty," which, he claims, can be committed "without force against the person or property of another." AOB 25 (citations and quotations omitted). But the case Taylor cites in support of his argument, *State v. Hammond*, 36 S.C.L. 91 (S.C. App. L. 1850),[3] holds no such thing—that case involved a defendant who killed his father by stabbing him with a knife, and thus obviously directed force at his victim.

Nevada courts have likewise found "disregard of social duty" in cases where a defendant has directed force at the person of another. *See, e.g., Grayson v. State*, 134 Nev. 945 (Nev. App. 2018) ("drawing the firearm signified a recklessness of others' lives and safety and firing it at an unarmed person with their arms in the air was in disregard of social duty"); *Ayala v. State*, 128 Nev. 880 (2012) (unpublished) ("Malice, as applied to murder, does not necessarily import ill will toward the victim, but signifies general malignant recklessness of others' lives and safety or disregard of social duty…. Malice aforethought may be inferred from the intentional use of a deadly weapon in a deadly and dangerous manner…. Malice supports Ayala's conviction for second-degree murder because Ayala fired shots into a crowd

---

[3]     Even if this 172-year-old case squarely supported Taylor's argument, it would have limited value, as it interprets South Carolina, not Nevada, law.

of people who had not provoked him in complete disregard for their lives.")
(citations and quotations omitted); *Cruz v. State*, 128 Nev. 891 (2012) (similar);
*Turner v. State*, 129 Nev. 1158 (2013) (unpublished) (noting that "[m]alice may
be implied from an assault and battery with the hands or fists alone if evidence
showing the character of the assault and the circumstances under which it was
made signifies general malignant recklessness of others' lives and safety or
disregard of social duty," and upholding second-degree murder conviction
when the defendant instructed his sister to "take care" of the victim, the sister
attacked the victim, "Turner pulled the victim's head back by her hair and
punched her once in the face, knocking her unconscious with a blow
described by the medical examiner as 'very forceful,'" and the codefendant
kicked the victim once in the face, leaving a footprint).

Taylor has not cited, and the government has not found, any case
holding that a killing committed with mere recklessness, or a killing
accomplished without force directed toward the victim, can constitute second-
degree murder in Nevada. And indeed, the Nevada Supreme Court has
explicitly *rejected* a claim that a death resulting from drunk driving is second-
degree murder because it "per se is inherently dangerous and naturally tends
to destroy human life." *Sheriff, Douglas Cnty. v. LaMotte*, 100 Nev. 270, 272
(1984). Taylor's argument therefore fails.

**D.      Taylor Cannot Show Actual Innocence.**

A claim of actual innocence "must be supported by new reliable evidence that was not presented at trial ...." *Schlup v. Delo*, 513 U.S. 298, 299. (1995). On appeal, Taylor notes that some witnesses testified he was not present when Dunlap was murdered. AOB 9-11. But this evidence was presented at trial, *see id.*, and the jury rejected it. As explained above, the evidence presented against Taylor at trial was overwhelming. Specifically with respect to his murdering Billy Ray Thomas, multiple witnesses confirmed that he was at the scene with a firearm, and two witnesses testified that Taylor subsequently bragged to them about participating in the murder. *See ante*, 9–13. Taylor already disputed the sufficiency of the evidence on direct appeal, and this Court rejected that argument. *Taylor*, 617 F. App'x at 672. He cannot show actual innocence.

**E.      Taylor's Procedurally Defaulted Claim Lacks Merit in Any Event.**

Even if this Court were to excuse Taylor's procedural default and reach the merits of his argument, it should reject it. As explained above in the section discussing prejudice, his argument is invalid. Nevada second-degree murder is a crime of violence within the meaning of 18 U.S.C. § 924(c)(3)(a).

# VII.

# CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court affirm.

Dated this 16th day of November 2022.

> JASON M. FRIERSON
> United States Attorney
>
> ELIZABETH O. WHITE
> Appellate Chief
>
>  s/ *Adam Flake*
> ADAM FLAKE
> Assistant United States Attorney
> 501 Las Vegas Blvd S. Ste. 1100
> Las Vegas, NV 89101
> (702) 388-6336
> *Attorneys for the United States*

# VIII.

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

Dated this 16th day of November 2022.


s/ *Adam Flake*
ADAM FLAKE
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1

I hereby certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the

attached **GOVERNMENT'S ANSWERING BRIEF** is proportionately

spaced, has a typeface of 14 points, and contains 4,904 words, excluding the

portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated this 16th day of November 2022.

*s/ Adam Flake*
ADAM FLAKE
Assistant United States Attorney